H21HEXXC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

EXXONMOBIL OIL CORPORATION,

                    Plaintiff,

            v.                          16 CV 9527 (ER)


TIG INSURANCE COMPANY,
                                        Oral Argument

                    Defendant.

------------------------------x
                                        New York, N.Y.
                                        February 1, 2017
                                        2:30 p.m.

Before:

                    HON. EDGARDO RAMOS,

                                        District Judge

                         APPEARANCES

COVINGTON & BURLING LLP
     Attorneys for Plaintiff
BY:  DONALD BROWN
     ALLAN B. MOORE

CARROLL MCNULTY KULL LLC
     Attorneys for Defendant
BY:  HEATHER E. SIMPSON

H21HEXXC

1        (Case called)

2        MR. BROWN:  Good afternoon.  Donald Brown, Covington &

3   Burling, here for ExxonMobil Oil Corporation.

4        MR. MOORE:  Allan Moore for ExxonMobil, also with

5   Covington.

6        MS. SIMPSON:  Good afternoon.  Heather Simpson from

7   Carroll, McNulty & Kull on behalf of TIG Insurance Company.

8        THE COURT:  Good afternoon to you all.

9        This matter is on for argument.  ExxonMobil is asking

10  me to compel TIG Insurance to proceed to binding arbitration

11  and to require it to dismiss the lawsuit it has, declaratory

12  judgment suit it has brought in New York State Supreme Court

13  concerning a contract of insurance.

14        So, Mr. Brown or Mr. Moore, let me begin with you.

15  You can remain seated or you can use the podium or you can

16  stand at the table, whatever makes you most comfortable.

17        MR. BROWN:  I'll go back and forth.  We'll see.  Thank

18  you, your Honor.  Appreciate it.

19        THE COURT:  Okay.

20        MR. BROWN:  So, yes, as your Honor said, we are here

21  petitioning for an order both compelling TIG to arbitrate the

22  dispute we have with them and not to proceed with the state

23  court proceedings they filed next door.  We moved pursuant to

24  the Federal Arbitration Act, specifically Section 4.  The

25  provision in the insurance policy that is an arbitration

H21HEXXC

1    provision that's known as the alternative dispute resolution

2    endorsement, I don't know if your Honor has it in front of you,

3    but if not, I have a copy of that page to hand up to the Court.

4              THE COURT:  I have endorsement No. 11 in front of me.

5              MR. BROWN:  Okay.  Generally speaking, your Honor,

6    what I would like to briefly address in my time this afternoon

7    is four things:  (1) what that ADR endorsement says and what it

8    means; (2) how TIG would have the Court read the endorsement;

9    (3) how and why TIG's reading of the endorsement both does not

10   comport with its language and, on reflection, really does not

11   make sense; (4) how the strong public policy favoring

12   arbitration affects the analysis here.

13             THE COURT:  Okay.

14             MR. BROWN:  Maybe I'll start there.  As this Court

15   well knows, Section 4 of the FAA requires courts, mandates

16   courts, order arbitration if there is an enforceable

17   arbitration agreement between the parties that encompasses the

18   claim at issue.  The public policy is strong.  The courts

19   strongly favor arbitrations.  The Second Circuit said in

20   *Collins*, "Federal policy requires courts to construe

21   arbitration clauses as broadly as possible."  And also, the

22   party resisting arbitration, TIG here, it bears the burden of

23   proving that the claims at issue are not subject to

24   arbitration, whether TIG is denying that there is an agreement

25   to arbitrate and/or TIG is denying that the agreement to

H21HEXXC

1    arbitrate encompasses the claims at issue here, the burden of

2    proof rests with them.

3            So if we may, your Honor, let's look at Endorsement

4    11.

5            THE COURT:  Okay.

6            MR. BROWN:  It's going to sound like I'm going to read

7    the whole thing to you, but I promise you, I'm not.  It starts

8    out in the introductory paragraph saying that if the company,

9    which is TIG, and the insured disagree after making a good

10   faith effort to reach an agreement on an issue concerning this

11   policy, either party may request that the following procedure

12   be used to settle such disagreement.

13           As an aside here, noting the reference to making a

14   good faith effort to reach a compromise, at least four times in

15   their brief TIG, almost as an aside but a little bit snidely,

16   says ExxonMobil did not request arbitration until after TIG

17   filed its lawsuit on November 30.  I think we've made it clear

18   in our papers, but we had been engaging in a good faith effort,

19   first of all, to see whether we had a disagreement by meeting

20   with TIG in Dallas on November 3.  It was our first meeting to

21   talk about this claim.  And at that meeting, which was a

22   settlement meeting, and I will not get into it in any detail,

23   we ended by them saying they needed to go back East to talk to

24   some people, and they would get back to us about further

25   discussions.  That's where we were when they out of the blue

H21HEXXC

1    sued us.

2          So the notion that we sat on our rights, that we had

3    no intention to arbitrate if there were a dispute, and that

4    we're only doing it in response to this lawsuit they filed is

5    not correct.  We were exercising our rights, seeking a good

6    faith compromise when, without warning, a shot was fired.

7          THE COURT:  In any event, the filing of a lawsuit by

8    one party, does that prohibit the other party from seeking

9    arbitration at that point?

10         MR. BROWN:  No, they raise the point only as a point

11   of persuasion rather than a point of preclusion, I think.

12   That's the way I look at it.

13         THE COURT:  Okay.

14         MR. BROWN:  In the paragraph numbered 1, it says, the

15   endorsement:  Either the company or the insured may request to

16   the other in writing that the dispute be setted by an

17   alternative dispute resolution, ADR process, selected according

18   to the procedures described herein.  That reference to

19   "procedures," plural, is a reference to the two alternative

20   procedures down below for selecting the type of ADR process to

21   be used.  And the first procedure for selecting the type is in

22   paragraph 2.  Paragraph 2 provides, in essence, that if the

23   parties agree to jointly select an ADR process, that's how it

24   "will be done."  If they agree to do it that way, it will be

25   done that way.

H21HEXXC

1          The other alternative procedure for selecting the type

2   of ADR process is paragraph 4.  If the parties cannot agree on

3   an ADR process within 90 days of the written request described

4   in paragraph 1, the parties shall use binding arbitration.

5   This paragraph 4 read with paragraph 1, to which paragraph 4

6   explicitly, expressly refers, there is no reference to

7   paragraph 2, paragraph 1 and 4 together say this.  One provides

8   that either party may request ADR and, if the parties cannot

9   agree to the type of ADR, four provides they shall enter into

10  mandatory arbitration.  This is a mandatory arbitration clause,

11  pure and simple.

12          THE COURT:  Give me some history, if you would,

13  Mr. Brown.  In your reply brief you talk about it a little

14  more.  But this contract used to have some sort of standard

15  form binding arbitration provision; correct?

16          MR. BROWN:  Yes.

17          THE COURT:  And then at some point it switched over to

18  Endorsement No. 11?

19          MR. BROWN:  No, it was issued with Endorsement No. 11.

20  I don't know how familiar you are with the insurance industry,

21  but it's commonplace to start with a policy body, and then

22  issue it on day one with -- I've seen as many as 100

23  endorsements, but this was an original endorsement issued on

24  the first day.

25          THE COURT:  Once upon a time I used to work under

H21HEXXC

1    Barry Ostrager, so I know a little about this stuff.

2               So you used a standard form policy, and then this

3    endorsement was included.  How am I supposed to interpret this

4    endorsement?

5               MR. BROWN:  Well, the way I just said is how you

6    should interpret it.  It says either party can initiate ADR.

7    Once a party initiates ADR, the other party has two choices,

8    either to say I will agree to the type of process with you or

9    not agree, in which case there's a default in paragraph 4,

10   which is mandatory arbitration.

11              THE COURT:  Okay.

12              MR. BROWN:  TIG wants your Honor to look at the first

13   clause in paragraph 2.  It says if the company and the insured

14   agree to so proceed.  They want your Honor to conclude that

15   that refers to an agreement to have an ADR at all.  It's our

16   position that it is more logically and syntactically understood

17   to refer to the rest of the sentence it is in; that is, it's a

18   reference to if the parties agree that they will proceed by

19   procedure one for selecting an ADR process, mutual agreement,

20   then they "will do so."  If they don't agree to do that and 90

21   days pass, paragraph 4 kicks in, mandatory arbitration.

22              So they have an option to agree to something else, but

23   if they can't within 90 days of the request, mandatory

24   arbitration under paragraph 4.  That's a more logical and

25   syntactical reading of it.  As we said in our brief, it's a

H21HEXXC

1    sentence much like if the parties agree, they will do such and

2    such.  If the parties agree to operate in this way, they will

3    do so.  That's why it says "will."  If that meant if the

4    parties agreed to ADR, rather than if the party agree to select

5    the ADR by joint selection, if it meant if the parties agree to

6    ADR, it would go on to say, then they may agree to the process.

7    But it says "will," will, because the preceding clause is

8    talking about an agreement to do so, in which case they will do

9    so.  If they don't do so, paragraph 4 is the default, binding

10   mandatory arbitration.

11           TIG argues in their papers that the ADR endorsement,

12   eight detailed paragraphs about how to resolve disputes through

13   ADR, is nothing more than an agreement to arbitrate if, when

14   asked, TIG agrees to arbitrate.  That really makes no sense

15   when you think about it for at least two reasons that I'll

16   highlight.  TIG's interpretation boils that whole

17   eight-paragraph provision, a full page, down to this and no

18   more than this, an agreement that is "TIG agrees to arbitrate

19   if and when TIG agrees to arbitrate.  That's what they say:  We

20   will arbitrate if and only if we agree to arbitrate.

21           That makes no sense.  Such a provision would

22   accomplish nothing because a party will always agree to

23   arbitrate if a party agrees to arbitrate, or a party will agree

24   to ADR if a party agrees to ADR.  There's no need to have any

25   contractual provision that says so.  And the notion that the

H21HEXXC

1    parties would prepare and agree to a detailed process, such as

2    we've seen in Endorsement No. 11, when really all it says is if

3    the parties agree later to arbitrate, they will arbitrate, it's

4    a pointless provision.  And it's sort of silly to think they

5    went through that exercise for no point.

6              I mean, indeed, if a request is made for ADR now and

7    it works the way TIG says and it only goes into play if they

8    agree, they can say, or the other way around, I could say if

9    she asks me:  Well, sure, we'll do ADR, but if, and only if,

10   and then set out 12 other criteria, none of which is in here,

11   as a condition for agreeing to ADR.  This is a meaningless

12   provision other than if we agreed down the road to arbitrate,

13   we'll arbitrate.

14             THE COURT:  I take it that since there was no case

15   that specifically attempted to interpret this precise

16   endorsement, at least none that was cited to us, I take it that

17   there is no such case out there?

18             MR. BROWN:  We've looked and haven't found one, your

19   Honor.

20             THE COURT:  That leads me to the question, is this

21   endorsement *sui generis* or is this something standard in the

22   industry?  Was it customized by the parties?

23             MR. BROWN:  I don't know the answer to that.  My best

24   guess is, it's an educated guess, that it was crafted by the

25   broker working with the parties, but I don't really know.  It's

H21HEXXC

1    not *sui generis* in the sense that I've never seen anything in

2    there before, but in toto, I've not seen anything like this

3    before.

4                 THE COURT:  Okay.

5                 MR. BROWN:  Last point, and it's a point coming off

6    the point I just made, the second reason TIG's interpretation

7    makes no sense.  You see paragraph 4, it's the biggest

8    paragraph, it's the part, if the parties cannot agree on an ADR

9    process within 90 days, the parties "shall use binding

10   arbitration."  If TIG's interpretation were correct,

11   paragraph 4 never will or would or could ever be invoked.

12               Here's what I mean.  If one party says:  I want to do

13   ADR process, the other party, who I'm going to presume does not

14   want binding arbitration, can say -- if a precondition is they

15   have to agree to ADR, they can say:  I will agree to ADR if,

16   but only if, you agree it will not be binding arbitration.  And

17   if you're insisting that it be binding arbitration, then I'm

18   not going to agree.  In that way there would never be binding

19   arbitration under this provision unless both sides mutually

20   agree.

21               That makes paragraph 4, and as Mr. Ostrager will tell

22   us, mere surplusage -- I should say Justice Ostrager -- and we

23   cannot interpret contracts that turn provisions into

24   meaningless mere surplusage provision.  This endorsement needs

25   to be interpreted to give paragraph 4 meaning and effect by

H21HEXXC

1  interpreting the endorsement as an agreement to enter into an

2  ADR and an agreement to enter into a binding arbitration if the

3  parties cannot otherwise agree on another process.

4                  THE COURT:  Okay.

5                  MR. BROWN:  Thank you, your Honor.

6                  THE COURT:  Ms. Simpson.

7                  MS. SIMPSON:  Thank you, your Honor, and I'll keep my

8  comments brief.  I think the arguments were pretty well framed

9  in the briefing.

10                 As Mr. Brown stated, there's generally a two-part test

11  to determine whether a matter should be sent to arbitration.

12  The first prong is whether there's a valid agreement to

13  arbitrate.  The second is whether the particular dispute is

14  within the scope of that agreement.  A party cannot be

15  compelled to arbitrate a dispute for which it had not

16  previously agreed to arbitrate.  And in determining whether a

17  party so agreed, courts will apply ordinary contract

18  interpretation principles.

19                 Moving to the document itself, Endorsement No. 11, as

20  your Honor noted, the policy originally included a binding

21  London arbitration provision.  And the parties agreed, by way

22  of Endorsement 11, to delete that endorsement, delete that

23  onerous binding arbitration obligation, and to instead replace

24  it with Endorsement 11 which is a much more flexible ADR

25  endorsement that puts the power of the mechanism in the

H21HEXXC

1    parties' hands.

2            THE COURT:  Let me ask you this before you go on, and

3    I'm sorry to interrupt.  Do you agree that the precise dispute

4    between you is arbitrable, assuming from your perspective both

5    sides agree to arbitrate it?

6            MS. SIMPSON:  Sure.  Your Honor, if both parties agree

7    to arbitrate, I believe they would be within their rights under

8    this policy, under this endorsement, to do so.

9            THE COURT:  Okay.

10           MS. SIMPSON:  So the analysis we've set forth in the

11   brief of how you interpret this is basically a three step

12   process which we believe Exxon truncates to a two step and

13   leaves out an important middle step.

14           First, and I think we all agree, step one says either

15   party may request in writing that the dispute be settled by an

16   alternative dispute resolution process.  I would note here,

17   your Honor, that the language is may request.  It's not may

18   demand, may invoke, may enforce.  It's request in writing.  So

19   right there, just with the language that's used, it implies

20   that there would have to be some sort of acceptance to that

21   request to move forward.

22           The second step, which Exxon seems to either skip past

23   or really misconstrue, is paragraph 2.  If the company and the

24   insured agree to so proceed, they will jointly select an ADR

25   process for settlement of the dispute.  So what that is

H21HEXXC

1   basically saying is if Exxon requests that they want to use ADR

2   and we say, Hey, ADR sounds great.  We don't want to be in

3   court, we can talk with Exxon and decide which ADR mechanism

4   would be the best for our dispute.

5        Step three, and that's paragraph 4, if we can't agree,

6   if I say I want arbitration with three arbitrators and he says

7   I want it with one, I say I want to have it in Seattle, he says

8   he wants to have it in New York, we can't agree, 90 days go by,

9   well, boom, we go to four; and then we are told if we can't

10  agree, we will go to binding arbitration.

11       THE COURT:  Now, the petitioner characterizes your

12  reading of this endorsement as, essentially, it being an

13  agreement to agree.  Why isn't it?  And if it is, is it

14  enforceable?

15       MS. SIMPSON:  Your Honor, I do not believe it is an

16  agreement to agree because it's setting forth a specific

17  mechanism to save the parties time and effort in the event of

18  an impasse.  It's basically saying any party can request ADR.

19  You're not bound to use ADR.  There's nothing in here that

20  prohibits litigation.  There's nothing in here that says you

21  must use this process.  It just says:  Hey, if you want to use

22  this process to use ADR for a dispute, this is what you're

23  going to do.  And if you reach a stalemate after 90 days, it's

24  over; this is the process you're using.

25       That could come in handy a lot, your Honor, because

H21HEXXC

1    oftentimes I've been involved in cases where we both agree to

2    binding arbitration, but for months and months we're fighting

3    over logistics, how many arbitrators, where we're going to have

4    it, all those variables that this endorsement would take care

5    of in the event that both parties agree to ADR but fight over

6    the mechanism.

7         So I don't think it's an agreement to agree.  I think

8    it does have a purpose.  It's not rendered meaningless, by our

9    reading.  It's just ensuring that both parties are comfortable

10   with using ADA.  Mr. Brown will say:  Well, this agreement just

11   says if TIG wants to arbitrate, then TIG gets to arbitrate.  It

12   works both ways.  If we serve them with an arbitration demand

13   and they didn't want to arbitrate, they'd be able to voice that

14   opinion as well.

15        THE COURT:  The value, from your perspective, that

16   this endorsement provides is that if there is an agreement to

17   arbitrate, then this provides a mechanism for ensuring that

18   there's arbitration at the end of the day?

19        MS. SIMPSON:  That's partially correct, because I

20   think this is broader than arbitration.  It's all ADR.  So if

21   you wanted to do some sort of mediation or hybrid proceeding,

22   whatever you may want, you can do so.  But this goes a step

23   further and says, but at a certain point, we're going to tell

24   you what you're going to do.  And there's other things that are

25   put in here.  For instance, the expenses will be shared by the

H21HEXXC

1    parties.  If it goes to arbitration, any award is capped at the

2    limits of the policy.  It wouldn't include extracontractual

3    damages.  So there's other things that are locked in here.

4              THE COURT:  How would that work?  So I go to you and I

5    say, I want to arbitrate; and you say, Okay.  And then we fight

6    about it; and then you say, Okay.  I don't want to arbitrate.

7    What happens?  Or I want to engage in some sort of ADR.

8              MS. SIMPSON:  Well, I think, once a party has accepted

9    the concept of ADR, once you go down that road, you open the

10   door, so to speak, you may be subject to the binding default.

11   But not when you say:  No, I'm not going to engage in ADR.  I

12   don't have an interest in that, and I want to litigate, which

13   is my right under this policy.  There's nothing in the whole

14   policy that prohibits litigation.

15             THE COURT:  Okay.  That's not what happened here;

16   correct?  I mean, when you had these discussions prior to your

17   bringing suit across the street, there was no talk of

18   arbitration or ADR or this endorsement.

19             MS. SIMPSON:  There was not.  There's correspondence

20   exchanged over the course of a year.  We did have one meeting,

21   as Mr. Brown indicated.  Not getting into specifics, but it

22   definitely wasn't left at that meeting that we were on the

23   brink of getting something done.  We did not bring a suit until

24   almost a month later.  The references to timing that we put in

25   our brief were more just to show that at the time we filed, we

H21HEXXC

1    weren't doing it in the face of a request to arbitrate, because

2    had we been, we might have some obligation to talk with them or

3    decline the request.  We filed a state court action, as is our

4    right under the policy, before there had been any request to

5    arbitrate this dispute.

6           I think your Honor's right.  The timing's not really

7    relevant here.  I think the issue is that they made a request

8    to do ADR.  We do not agree, and so therefore we are not bound

9    by paragraph 4.  When we read their reply brief, it was

10   confusing, frankly.  I think they come up with a quite tortured

11   reading to get where they want to go.  And I understand why

12   that's their position, and they have to come up with a textual

13   argument, but it's certainly a lot of grammatical or

14   syntactical gymnastics to get there.  I think it can be boiled

15   down to them converting paragraph 2 to a statement that says,

16   if the parties agree to agree, they will agree.  That's

17   basically the way they would have the Court construe paragraph

18   2, and that simply is not a logical reading, I would submit.

19          THE COURT:  I think that's what they're saying you are

20   saying.

21          MS. SIMPSON:  No, they're saying that's what we're

22   saying about the endorsement in general, which I thought was

23   ironic.  But their example of how they construe two is if the

24   parties agree to jointly select, they will jointly select.  But

25   that goes without saying that if we jointly agree to select, we

H21HEXXC

1    will do that.  The language naturally follows upon paragraph 1

2    that says a party may request in writing to the other to employ

3    ADR.  If they so agree, if they agree to so proceed, then they

4    will move on to the next step.  That is our view.  That's our

5    reading.  It's consistent with the plain language, which this

6    Court is bound to apply under contract interpretation

7    principles.

8            THE COURT:  What should I do with that introductory

9    paragraph?

10           MS. SIMPSON:  Your Honor, I mean, I see the

11   introductory paragraph just kind of echoing the sentiment that

12   this isn't a mandatory endorsement at all.  If a party wants to

13   initiate an attempt to complete ADR, they may request it.  I'm

14   not sure what I'm missing here.

15           THE COURT:  Why doesn't that trigger the process?

16           MS. SIMPSON:  It triggers the process if we say:

17   Yeah, hey, ADR sounds great, then we're in this process.

18           THE COURT:  But that's not what that paragraph says.

19   This says either party may request.  So the party requests, why

20   isn't the process started at that point?

21           MS. SIMPSON:  The process is started, your Honor, and

22   then it comes to number two, and number two tells us if the

23   company and the insured agree to so proceed with the ADR

24   process, they will jointly select, or if they can't, then

25   they'll go to mandatory arbitration.  Step two gives that other

 1    party the right.  And, again, I would echo back to the

 2    language.  What does request mean?  If it was automatic and it

 3    was unilateral, they could just say:  We want arbitration, and

 4    we're entitled to it.  Why would it say request?  This --

 5         THE COURT:  Because they can go to court, but they've

 6    requested an alternative method.  And having requested an

 7    alternative method, now there are obligations on both sides.

 8         MS. SIMPSON:  I don't read it that way, your Honor,

 9    because I think step two necessarily tells us that the parties

10    have to agree to move forward with ADR, and that's why they

11    have a flexible ADR endorsement and not one -- it would be very

12    easy, your Honor, to just say either party can submit this to

13    binding arbitration, and here's how we're going to do it.

14    That's not what it says.  And keeping in mind that this was put

15    in deliberately after one mandatory arbitration clause was

16    removed would lead me to believe that this is giving the

17    parties more flexibility, and it's not going to allow anyone to

18    be pushed into arbitration unless they agree to do so.  And

19    that is fair because no party can be deprived of their right of

20    litigation unless they agree to do so, and that's why step two

21    says if the company and the insured agree to so proceed.

22         THE COURT:  Okay.

23         MS. SIMPSON:  Your Honor, I think I've stated all my

24    points.  We believe we have a textually logical interpretation

25    of the language, despite Mr. Brown's reference to the federal

H21HEXXC

1  policy in favor of arbitration.  That policy does not trump

2  basic contract interpretation that the language must be

3  enforced as written.

4          THE COURT:  Is their reading of it illogical?

5          MS. SIMPSON:  I believe it is illogical, your Honor,

6  because why would you need to say if we agree, then we agree?

7          THE COURT:  Okay.

8          MS. SIMPSON:  That's all, your Honor.

9          THE COURT:  Mr. Brown, I'll give you the last word, if

10 you wish.

11         MR. BROWN:  Yes, a few points.  One, it was said that

12 there's nothing in the policy that prevents litigation.  I

13 suppose other than Endorsement 11, if it does, if someone

14 requests ADR.  There is nothing in the policy elsewise that

15 supports the notion of litigation.  There's no service of suit

16 clause.  There's no choice of venue clause.  There's no choice

17 of law clause for a company that does business all around the

18 world.  I'm not saying that's dispositive, but that's the side

19 of that story.  It doesn't reflect an intention to litigate; it

20 only reflects this option that either party can exercise to go

21 into an ADR process.

22         Second point, yes, Endorsement 11 replaces Condition

23 O.  Actually, not really.  Endorsement 10 deletes Condition O,

24 and then Endorsement 11 is there and says what it says.  It is

25 more flexible than what Condition O said.  Condition O said

H21HEXXC

1   "shall."  This one is we shall in paragraph 4 if one side

2   invokes it, so it is more flexible.  If neither side invokes

3   it, as your Honor said, they can go to court.  The first one

4   didn't allow that.  The first one required us to arbitrate in

5   England; this one requires us to do it in New York.  The

6   parties changed their mind about that.  This one, Endorsement

7   11 is not limited in its possibilities to arbitration.  There

8   is the possibility of nonbinding arbitration, mediation, etc.

9   The provision itself even says, or something else not in this

10  provision to be agreed to.

11          So, yes, it is more flexible.  But if the parties

12  intended to agree to nothing more than if down the road we

13  agree to ADR, we'll agree to ADR, all they had to do was take

14  Condition O out and not replace it.  Replacing it with this

15  detail, as I've argued already, tells us that if one party

16  invokes ADR, this becomes a mandatory provision.

17          Third point, your Honor in colloquy with counsel asked

18  whether the intention on TIG's part was that if this gets

19  invoked in the end, mandatory arbitration would be preserved as

20  the final option.  This gets back to my point before.

21  Ms. Simpson sort of blithely said if we asked or they asked for

22  ADR in step two, the other side has to say yes or no.  They

23  don't have to say yes or no.  In our interpretation, they have

24  to say, we will jointly stipulate to a process with you and

25  then do it or not, in which case four comes in.  But even under

H21HEXXC

Ms. Simpson's interpretation, they don't have to just say yes

or no.  As I said, they can say yes, but only if, and anything

you can imagine could come after "only if," if you interpret

this endorsement the way she does, which is we can't do

anything in terms of an ADR process without TIG's agreement.

And if TIG could say if, but only if, they can say

only if it's in England, they can say only if we get to pick

the arbitrator and you don't; but they could also say only if

we're not going to have arbitration, because they don't want to

have an arbitration.  In which case, that default mandatory

arbitration provision is not preserved.  It's easily avoided.

It's completely avoidable.  And if you have a case where one

party does not want that default, it will not happen ever.

As I said in my opening remarks, we just can't

interpret it in a way such that provision four goes away

altogether, which TIG's interpretation would do.  Thank you,

your Honor.

THE COURT:  Thank you.

Give me five minutes.  I'll give you an answer.

(Recess)

THE COURT:  Petitioner herein seeks to compel

arbitration pursuant to Section 4 of the Federal Arbitration

Act, which is at 9 U.S.C. Section 4.  Under the FAA, the role

of the courts is limited to determining two issues:  (1)

whether a valid agreement or obligation to arbitrate exists and

H21HEXXC

1    (2) whether one party to the agreement has failed, neglected,

2    or refused to arbitrate, citing *Shaw Group Inc. v. Triplefine*

3    *International Corp.*, which is reported at 322 F.3d 115.

4    Respondent has not challenged the second element, whether one

5    party to the agreement has failed, neglected, or refused.

6    Therefore, the issue before the Court under the FAA Section 4

7    is whether a valid agreement or obligation to arbitrate exists.

8         The United States Court of Appeals for the Second

9    Circuit has set forth a two-part test to evaluate arbitrability

10   of claims, requiring a determination as to, first, whether

11   there exists a valid agreement to arbitrate at all under the

12   contract in question, and if so, secondly, whether the

13   particular dispute sought to be arbitrated falls within the

14   scope of the arbitration agreement, citing *Hartford Accident &*

15   *Indemnity Co. v. Swiss Reinsurance*, which is reported at 246

16   F.3d 219.

17        In considering whether arbitration is required under

18   the FAA, courts have applied state law contract interpretation

19   principles; and, therefore, the Court applies the law of New

20   York.  And under New York law, the words and phrases in the

21   contract must be given their plain meaning so as to define the

22   rights of the parties, citing *Mazzola v. County of Suffolk*, 143

23   A.D.2d 734.  That's a Second Department case.

24        The key language underlying the parties' dispute is

25   the first clause of paragraph 2 of Endorsement 11.  Paragraph 2

H21HEXXC

1    states in full:  "If the company and the insured agree to so

2    proceed, they will jointly select an ADR process for settlement

3    of the dispute."  Respondent argues that "if the company and

4    the insured agree to so proceed" refers to whether the parties

5    agree to proceed to an alternative dispute resolution process

6    at all.  Petitioner argues that the clause refers to whether

7    the parties agree to jointly select an ADR process, such as

8    mediation or binding arbitration, and not whether the parties

9    agree to some form of ADR.

10         The Court agrees that the plain meaning of

11   paragraph 2, construed within the context of the entire

12   endorsement, is that the reference to "agree to so proceed"

13   relates to and draws its meaning from the language that

14   immediately follows, that is, "jointly select an ADR process,"

15   rather than the language in paragraph 1, as respondent

16   suggests.  Paragraph 2 is a sentence that contains an

17   introductory clause which provides background information for

18   the independent clause which follows after the comma.  In this

19   case, the clause begins, the introductory clause, with the

20   conjunction "if."  The subordinate clause "if the company and

21   the insured agree to so proceed" relates to the remainder of

22   the sentence's independent clause which states that they will

23   jointly select an ADR process for settlement of the dispute.

24   Therefore, under the plain meaning of the contract, either

25   party can invoke the endorsement by requesting in writing that

H21HEXXC

a dispute be settled using an ADR process, and then the

specific ADR process is chosen either jointly by agreement or

defaults to binding arbitrations if the parties cannot agree.

Additionally, as respondent properly points out, under

New York law a contract will be construed so as to give force

and effect to all of its provisions, citing *Trump-Equitable*

*Fifth Ave. Co. v. HRH Construction Corp.*, which is cited or

reported at 106 A.D.2d 242, a First Department case.   However,

respondent's petition asks this Court to treat this endorsement

as purely voluntarily, as if the parties adopted the

endorsement without intending it to have any binding effect

absent some further agreement.   Respondent's interpretation

that the language "if the parties agree to so proceed" refers

to an agreement to use ADR at all would render the entire

endorsement an unenforceable and superfluous agreement to

agree, under which neither party could require any form of ADR

absent some further agreement.

In short, paragraph 2 provides that the parties may

agree to proceed by jointly selecting an ADR process.   However,

if the parties cannot agree on a particular process, then the

second alternative is triggered, and they must proceed to

binding arbitration.   Paragraphs 2 and 4 work together, the

former providing for an agreement on a particular procedure,

and the latter requiring binding arbitration.

This interpretation of the endorsement is consistent

H21HEXXC

1   with the federal policy in favor of construing arbitration

2   clauses broadly.  *See, for example, China Auto Care LLC v.*

3   *China Auto Care Caymans,* reported at 859 F.Supp.2d 582, and

4   that's a case from the Southern District of New York in 2012.

5          Therefore, the Court grants the petition to compel

6   arbitration.  The Court will retain jurisdiction to consider

7   any issues that may arise after the arbitrators have rendered

8   their awards and stay the proceedings in this matter pending

9   arbitration, pursuant to the authority in *Katz v. Cellco*

10  *Partnership*, which is reported at 794 F.3d 341, that's a Second

11  Circuit case from 2015, and cert was denied by the Supreme

12  Court and reported at 136 S.Ct. 596.  And in the Second Circuit

13  the Court noted the text, structure, and underlying policy of

14  the FAA mandate a stay of proceedings when all of the claims in

15  an action have been referred to arbitration and a stay

16  requested.

17          Additionally, petitioner asked the Court to order

18  respondent to discontinue its declaratory judgment action in

19  the New York Supreme Court.  As a general rule, courts are

20  prohibited from enjoining proceedings in state court by the

21  Anti-injunction Statute contained at 28 U.S.C. Section 2283.

22  There are, however, exceptions to the statute.  *See Atlantic*

23  *Coast Lines Rail Company v. Brotherhood of Locomotive*

24  *Engineers,* a Supreme Court case reported at 398 U.S. 281 from

25  1970.  Pursuant to the Anti-Injunction Act, a Court may not

H21HEXXC

1    issue such a stay except as expressly authorized by act of

2    Congress or where necessary in aid of its jurisdiction or to

3    protect or effectuate its judgments.  The courts in this

4    district have consistently held that a stay, when issued

5    subsequent to or in conjunction with an order compelling

6    arbitration concerning the same subject matter as the state

7    proceeding, falls within one or both of the latter two

8    exceptions.  *See, for example, Matter of Arbitration Between*

9    *Nuclear Electrical Insurance Limited,* which is a Central Power

10   & Light Company, reported at 926 F.Supp. 428, a Southern

11   District case from 1996.  Therefore, the petitioner's request

12   to enjoin the respondent from proceeding in the New York State

13   Supreme Court action is granted.

14          That constitutes the decision of the Court, unless

15   there is anything further this afternoon from either side.

16          MR. BROWN:  Nothing further here, your Honor.

17          MS. SIMPSON:  No, your Honor.

18          THE COURT:  We're adjourned.

19          (Adjourned)

20

21

22

23

24

25