UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EXXONMOBIL OIL CORPORATION,

Petitioner,

– *against* –

TIG INSURANCE COMPANY,

Respondent.

**OPINION & ORDER**

16 Civ. 9527 (ER)

RAMOS, D.J.:

Over three years after the Court stayed this action and ordered the parties to arbitration, the Court is now faced with ExxonMobil Oil Corporation's ("Mobil"[1]) motion to lift the stay and confirm the arbitral award, and TIG Insurance Company's ("TIG") cross-motion to vacate that award.

Mobil's motion asks the Court to confirm the award and to enter a final judgment that includes pre-judgment interest.

TIG moves to vacate the arbitral tribunal's decision on the grounds that in defining a key term in the underlying insurance agreement, the arbitral tribunal stated that its analysis was "guided by applying common speech and the reasonable expectation and purpose of the ordinary businessman to determine the intent of the parties," an interpretive method long-used by New York courts in interpreting insurance agreements. TIG claims this interpretive principle is based on *contra proferentum* and is therefore contrary to the dictates in parties' contract that the policy be construed in an "evenhanded" manner.

For the reasons stated below, Mobil's motion is GRANTED and TIG's is DENIED.

---

[1] Because the insurance policy at issue here was entered into by Mobil Corporation, before its combination with Exxon, the Court refers to ExxonMobil Oil Corporation as Mobil.

I.      FACTUAL BACKGROUND

A.      The Policy

This action arises out of an insurance coverage dispute relating to an excess liability insurance policy between TIG and Mobil (the "Policy").  (Doc. 38-2.)  Under the Policy, part of a multi-layer tower of coverage, TIG assumed responsibility for $25 million in general liability coverage.  (Doc. 38-1 ¶ 1) (the "Award").

The Policy contains a New York choice of law provision, which specifies, in relevant part:

> This Policy shall be governed by and construed in accordance with the internal laws of the State of New York, . . . provided, however, that the provisions, stipulations, exclusions and conditions of this Policy are to be construed in an even-handed fashion as between the Insured and the Company; without limitation, where the language of this Policy is deemed to be ambiguous or otherwise unclear, the issue shall be resolved in the manner most consistent with the relevant provisions, stipulations, exclusions and conditions (without regard to authorship of the language, without any presumption or arbitrary interpretation or construction in favor of either the Insured or the Company and without reference to parol evidence).

(Doc. 38-2 at V(q).)

The Policy also contains an Alternative Dispute Resolution Endorsement ("ADR Endorsement") permitting the parties to resolve disputes through ADR.  (Doc. 38-2 at Endorsement No. 11.)  The ADR Endorsement provides:  "It is expressly agreed that any decision, award, or agreed settlement made as a result of an ADR process shall be limited to the limits of liability of this Policy."  (*Id.* at Endorsement No. 11 ¶ 6.)

B.      The Relevant Underlying Dispute and the Tribunal's Decision With Respect to Liability

The underlying dispute arises out of a number of lawsuits against Mobil seeking damages for contamination involving methyl tertiary butyl ether ("MTBE"), a gasoline additive Mobil once used.  (Doc. 37 at 3; Doc. 41 at 4.)  At least some of the alleged contamination arose from leaks from underground storage tanks at service stations. (Award ¶ 15; Doc. 41 at 4.)

2

The Policy includes a number of exclusions to coverage, including one relevant here, a pollution exclusion, that excepts from indemnity property damage "arising out of or alleged to arise out of the discharge, dispersal, release, or escape of pollutants into or upon land or other real estate, atmosphere, any watercourse or body of water whether above or below ground or otherwise into the environment." (Doc. 38-2 at IV(k)(1)(A).) The arbitral tribunal that presided over the parties' dispute (the "Tribunal"), noted that "[a]bsent an exception to this language, this provision would have excluded Mobil's claim for indemnity for its MBTE liability." (Award ¶ 17.) It does not appear that either party disputed this finding. As the Tribunal noted, however, "the parties did negotiate an exception from the pollution exclusion for damages arising out of claims for product liability," agreeing that it "does not apply to any liability of the Insured (1) for product liability . . . ." (*Id.* ¶ 18 (citing Doc. 38-2 at IV(k)(2)(A).) "Product Liability" is defined in the Policy as follows:

> The term "product liability" means liability for personal injury or property damage arising out of the end-use of goods or products manufactured, sold, tested, handled or distributed by the Insured or others trading under its name if such use occurs after the possession of such goods or products has been relinquished to others by the Insured or by others trading under its name and if such use occurs away from premises owned, rented or controlled by the Insured; provided such goods or products shall be deemed to include any container thereof other than a vehicle, watercraft or aircraft.

(Doc. 38-2 at III(n).)

Therefore, to determine whether Mobil was entitled to coverage for the leaks from the underground storage tanks at service stations, the Tribunal had to decide whether those leaks "aros[e] out of the end-use of goods or products manufactured, sold, tested, handled or distributed by [Mobil]." The parties provided the Tribunal with different meanings of the term "end-use." As summarized, by the Tribunal, TIG "argue[d] that 'end-use' must mean something more than use" and "that the correct interpretation is that "'end-use' is synonymous with 'use' by the 'end-user,' or consumer." (*Id.* ¶ 98.) Mobil "assert[ed] a broad definition that 'end-use' occurs when the product it manufactured is

put into the stream of commerce and potentially, Mobil contends, there could be multiple 'end-uses' along the course of production and distribution." (*Id.* ¶ 99.)   The Tribunal considered neither definition to be appropriate.  (*Id.* ¶ 100.)  Instead, the Tribunal reasoned that "end-use" refers to "the instant when the product, MTBE-treated gasoline, has made its way to the end of its distribution process and is the ultimate finished product available for purchase and use by an end user . . .." (*Id.* ¶ 103.)  The Tribunal reasoned that this interpretation of "end-use" was consistent with "the commonly understood meaning of the term and with the authorities cited by TIG," as well as New York statute, and found its interpretation to be "more logical and likely consistent with the expectations of the parties." (*Id.* ¶ 104.)   The Tribunal also noted that its analysis was "guided by applying common speech and the reasonable expectation and purpose of the ordinary businessman to determine the intent of the parties." (*Id.* ¶ 97.)

The Tribunal continued its analysis by interpreting the term "arising out of."  The Tribunal considered guidance offered by the New York Court of Appeals that "arising out of means" "originating from, incident to or having a connection with." (*Id.* ¶ 110.)  The Tribunal determined the Court of Appeals decision to be entitled to weight, but that "arising out of" could not be interpreted so broadly "as to swallow up the pollution exclusion." (*Id.* ¶ 111.)   The Tribunal therefore determined that "arising out of" "requires finding a nexus between the injury and the 'general nature of the operation in the course of which the injury was sustained.'" (*Id.*)  Ultimately, the Tribunal declined to draw a "a precise line of where the nexus is broken and becomes too remote," but found that "it is entirely reasonable to conclude that leaking from underground storage tanks where the MTBE gasoline has been delivered is not so remote as to preclude coverage." (*Id.* ¶ 113.)

The Tribunal also noted that even if it agreed with TIG's definition of "end-use," it would nonetheless find TIG liable because the leaks from the service stations would have a "sufficiently close nexus" to the definition of end-use TIG asserted. (*Id.* ¶ 114.)

### C.    The Tribunal's Decision With Respect to Interest

At the time the Tribunal issued its award, Mobil's MTBE losses were approximately $435 million.  (*Id.* at ¶ 144.)  Because, the Tribunal found that Mobil's covered liability exceeded TIG's layer, it found Mobil entitled to the Policy's full $25 million limit.  (*Id.* ¶ 145-147.)

Citing New York legal authorities, including case law and statutory provisions, Mobil requested the Tribunal also award it pre-judgment interest in an amount exceeding $6 million.  (*See* Award ¶¶ 133-136.)  The Tribunal, however, declined to do so concluding that the ADR Endorsement's language that "any decision, award, or agreed settlement made as a result of an ADR process shall be limited to the limits of liability of this policy" meant that the Tribunal "lack[ed] the jurisdiction to make an award that exceeds the limits of the" Policy.  (*Id.* ¶¶ 137-139.)  The Tribunal reasoned that its "decision [or] award" was "constrained by agreement of the parties to be no more than the policy limits" because the "common understanding of the terms arbitral 'decision' or 'award' would include interest."  (*Id.* ¶¶ 140.)  Finding that it lacked the jurisdiction to award interest, the Tribunal opined that a court might be able to do so.  (*Id.* ¶ 141 n. 4.)

## II.    LEGAL STANDARD

The Federal Arbitration Act provides a "streamlined" process for a party seeking "a judicial decree confirming an award, an order vacating it, or an order modifying or correcting it."  *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 582 (2008).  District courts "treat a petitioner's application to confirm or vacate an arbitral award as akin to a motion for summary judgment."  *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 136 (2d Cir. 2011) (quotation marks omitted).

Under the FAA, a court "must grant" a petition to confirm an arbitral award "unless the award is vacated, modified, or corrected as prescribed in [the FAA]."  9 U.S.C. § 9; *see also Trustees of New York City Dist. Council of Carpenters Pension Fund, Welfare Fund, Annuity Fund, & Apprenticeship, Journeyman Retraining, Educ. & Indus.*

*Fund v. Skyworx Contracting Inc.*, No. 19 Civ. 11638 (JPO), 2020 WL 764455, at *1 (S.D.N.Y. Feb. 14, 2020).  The arbitrator's rationale for an award need not be explained. *Leeward Constr. Co., Ltd. v. Am. Univ. of Antigua-Coll. of Med.*, 826 F.3d 634, 638 (2d Cir. 2016).  Confirmation of an arbitration award is thus "a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *Citigroup, Inc. v. Abu Dhabi Inv. Auth.*, 776 F.3d 126, 132 (2d Cir. 2015) (quoting *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006)).  This "severely limited" review promotes the twin goals of arbitration, namely to settle disputes efficiently and avoid long and expensive litigation.  *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir. 1997) (citations omitted).

Conversely, the showing required to avoid confirmation is very high.  *Leeward Constr. Co., Ltd.*, 826 F.3d at 638.  The party moving to vacate an award bears "the heavy burden of showing that the award falls within a very narrow set of circumstances delineated by statute and case law."  *Id.* (quoting *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388 (2d Cir. 2003)); s*ee Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010) (holding that a party seeking *vacatur* of an arbitrator's decision "must clear a high hurdle").  Under the FAA, a court may vacate an award:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

In addition, as "judicial gloss" on these specific grounds for vacatur, the Second Circuit has held that "the court may set aside an arbitration award if it was rendered in manifest disregard of the law."  *Schwartz v. Merrill Lynch & Co., Inc.*, 665 F.3d 444, 451 (2d Cir. 2011) (internal quotation marks omitted).  "A litigant seeking to vacate an arbitration award based on alleged manifest disregard of the law bears a heavy burden, as awards are vacated on grounds of manifest disregard only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent." *Weiss v. Sallie Mae, Inc.*, 939 F.3d 105, 109 (2d Cir. 2019) (quoting *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010).  An arbitral award will be upheld under this standard "so long as 'the arbitrator has provided even a barely colorable justification for his or her interpretation of the contract.'"  *Id.* (quoting *Schwartz v. Merrill Lynch & Co.*, 665 F.3d at 452).

## III.   DISCUSSION

### A.   TIG's Motion to Vacate

TIG argues the Award should be vacated because the Tribunal "manifestly disregarded the law."  (Doc. 41 at 8-13; Doc. 46 at 2-5.)

The Second Circuit has adopted a three part test to analyze such a claim:  (1) the Court "must consider whether the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators;" (2) the Court considers whether "the law was in fact improperly applied, leading to an erroneous outcome;" and (3) once the two previous inquiries are satisfied, the Court looks to "a subjective element, that is, the knowledge actually possessed by the arbitrators," and whether the arbitrator knew of the existence of the law and its "applicability to the problem before him."  *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389–90 (2d Cir. 2003) (internal citations omitted).

To briefly summarize the issue here, the Tribunal was tasked with deciding whether the activity Mobil sought coverage for, leaks from underground storage tanks at

service stations, "aros[e] out of the end-use of goods or products manufactured, sold, tested, handled or distributed by [Mobil]."  (Award ¶¶ 97-118 (citing Doc. 38-2 at 9).)  The parties provided the Tribunal with different meanings of the term "end-use," one, proposed by Mobil, that included the relevant activity and one, proposed by TIG, that excluded it.  The Tribunal rejected the interpretation offered by both parties, deciding "end-use" "to be the instant when the product, MTBE-treated gasoline, has made its way to the end of its distribution process and is the ultimate finished product available for purchase and use by an end user," a definition which would include the leaks from the service stations at issue here and lead to a result in Mobil's favor.  (Award ¶ 103.)  TIG objects to this decision because the Policy provides that "its terms are to be construed in an 'even-handed' fashion, with no presumptions in favor of either party," an interpretive methodology which, TIG argues, the Tribunal did not follow  (Doc. 41 at 5.)  Specifically, TIG argues that in interpreting "end-use," the Tribunal stated that its analysis was "guided by applying common speech and the *reasonable expectation and purpose of the ordinary businessman*."  (Doc. 41 at 10 (citing Award ¶ 97) (emphasis in TIG's brief).)  TIG contends that this principle "is based on law that adopts *contra proferentum* as a means of interpreting ambiguous language in a contract" and is therefore not "evenhanded."  (*Id*.)

TIG's argument has no merit.

1. The Tribunal Did Not Misapply the Law

There is no basis to conclude that interpreting a contract "by applying common speech and the reasonable expectation and purpose of the ordinary businessman" is anything other than an evenhanded interpretive method.  The method is simply that which courts have repeatedly recognized as the one to be used in interpreting insurance policies under New York law.  *See, e.g.*, *Stoney Run Co. v. Prudential-LMI Commercial Ins. Co.*, 47 F.3d 34, 37 (2d Cir. 1995) (quoting *Ace Wire & Cable Co. v. Aetna Casualty & Surety Co.*, 60 N.Y.2d 390, 398 (1983); *Silverman Neu, LLP v. Admiral Ins. Co.*, 933 F. Supp. 2d

463, 472 (E.D.N.Y. 2013) (quoting *GMAC v. Nationwide Ins. Co.,* 4 N.Y.3d 451, 457

(2005).  Courts have also applied it outside of the context of insurance contracts.  *See,*

*e.g.*, *Bank of New York v. Amoco Oil Co.*, 35 F.3d 643, 662 (2d Cir. 1994).

      As support for its view that this method is not evenhanded, TIG argues only that

the principle "is based on law that adopts *contra proferentum* as a means of interpreting

ambiguous language in a contract."  (Doc. 41 at 10.)  And, to buttress this assertion, TIG

argues only that the court in *Ace Wire*, the New York Court of Appeals decision cited by

the Tribunal as support for its application of the "ordinary businessman" method, "noted

directly after its reference to the reasonable expectations of an ordinary businessman that

the language must be construed against the insurer." [2]  (*Id.* at 10 (citing *Ace Wire*, 60

N.Y.2d at 398).)  TIG's argument misconstrues the court's reasoning.

      The relevant portion of *Ace Wire* states:

> The tests to be applied in construing an insurance policy are common speech
> (*Lewis v. Ocean Acc. & Guar. Corp.*, 224 N.Y. 18, 21, 120 N.E. 56) and the
> reasonable expectation and purpose of the ordinary businessman (*Bird v. St. Paul*
> *Fire & Mar. Ins. Co.*, 224 N.Y. 47, 51, 120 N.E. 86 (1918).  The ambiguities in an
> insurance policy are, moreover, to be construed against the insurer, particularly
> when found in an exclusionary clause (*see Breed v. Insurance Co.*, 46 N.Y.S.2d 351,
> 353, 413 N.Y.S.2d 352, 385 N.E.2d 1280).

*Ace Wire*, 60 N.Y.2d at 398.   The text suggests only that the Court of Appeals applied

two distinct interpretive principles—"the ordinary businessman" interpretive method and

the doctrine of construing ambiguities against the insurer—to the issue being considered

there.  The use of the word "moreover," and the court's note that *contra proferentum* only

---

[2] In its subsequent brief, TIG points to an opinion which states that "[t]he test for ambiguity in an insurance
agreement is whether 'an ordinary business man in applying for insurance and reading the language of
these policies . . . would have thought himself covered against precisely the damage claims now asserted."
(Doc. 46 at 4 (citing *U.S. Specialty Ins. Co. v. LeBeau, Inc.*, 847 F. supp. 2d 500, 503 (W.D.N.Y. 2012).
But, the Tribunal did not cite to this, or any similar, opinion, and the Tribunal made clear that the "ordinary
businessman" to whom it referred was not the one applying for insurance, as suggested by the case TIG
cites, but of both negotiating parties to the Policy.  (*See, e.g.* Award at ¶ 97 ("Our analysis is guided by
applying common speech and the reasonable expectation and purpose of the ordinary businessman *to*
*determine the intent of the parties*.") (emphasis added).)

applies in cases of ambiguity suggests that the court in *Ace Wire* viewed the principles as separate.  Further, it cited different cases to support the different principles.  And, *Bird*, which it cited for the "ordinary businessman" principle did not involve an application of *contra proferentum* and described the "ordinary businessman" inquiry as an evenhanded one.  *Bird v. St. Paul Fire & Marine Ins. Co.*, 224 N.Y. 47, 51 (1918) ("The inquiry for us is how far *the parties* to this contract intended us to go.  The causes within *their* contemplation are the only causes that concern us.") (emphases added).

Moreover, there is nothing in the Tribunal's decision that suggests that it applied the "ordinary businessman" interpretive principle in a manner that was not evenhanded.  For example, in rejecting TIG's proposed definition of "end-use," which it called "inconsistent with the expectations of a 'reasonable businessman," the Tribunal noted that the definition "would exclude a wide range of events that Mobil could reasonably have anticipated would be covered *and that TIG would logically have assumed to be within the risk to be insured*."  (Award ¶ 101) (emphasis added).  The Tribunal considered and rejected the interpretations put forward by *both* parties, and settled on a construction it viewed as "more logical and likely consistent with the expectations *of the parties*" and "consistent with the commonly understood meaning of the term and *with the authorities cited by TIG*."  (Award ¶¶ 102, 104) (emphases added).

2.   Even if the Tribunal Misapplied the Law, It Not Lead to an Erroneous Outcome

Even if the Court found that the Tribunal misapplied the law, which it does not, TIG would still not be entitled to *vacatur*.  In order to prevail, TIG would have to show that the misapplication of law led to an "erroneous outcome."  *See Duferco Int'l Steel Trading*, 333 F.3d at 390.  But, the Tribunal determined that even if it applied TIG's definition of "end-use," that it occurs when the consumer pumps the gasoline into her car, it would still find that the policy covered the leaks from the storage tanks at service stations because the policy covers activities "arising out of" "end-use."  (Award ¶ 114.)

TIG dismisses the Tribunal's finding to this effect as one unsupported by "significant discussion or application of the case law to [the] scenario" and states that it "is confident that, if the Panel properly interpreted 'end use,' it would not have adopted an absurd result in which an event could arise out of something that did not yet take place (*e.g.* leaks at a service station's underground storage tank cannot arise out of a consumer's consumption of gasoline that has not happened yet)."  (Doc. 46 at 4-5.)

TIG's argument has intuitive logic until one actually reads the Tribunal's decision and sees that the Tribunal carefully considered the issue and clearly, based on the logic of the decision, would indeed have come to the same result had it followed TIG's definition of "end-use."  The Tribunal devoted more than two pages of its decision to considering the definition of "arising out of," and gave weight to a New York Court of Appeals decision defining "arising out of" to mean "originating from, incident to or having a connection with."  (Award at ¶¶ 109-111 (quoting *Aetna Cas. & Sur. Co. v. Liberty Mut. Ins. Co.,* 91 A.D. 2d 317, 320-21 (1983)).)  Determining that "arising out of" required "finding a nexus between the injury and the general nature of the operation in the course of which the injury was sustained," and not necessarily a specific temporal order, the Tribunal found that "a driver of a car could never have purchased gasoline if it had not been stored at the service station.  Consequently, the leaking of the storage system would have a sufficiently close nexus to the general nature of the operation of refining, producing and distributing finished gasoline to satisfy the 'arising out of' clause."  (Award ¶¶ 111, 114) (citations omitted).

* * *

Finding, therefore, that the Tribunal provided a "barely colorable justification for [its] interpretation of the contract" and that TIG has not met its "heavy burden" of demonstrating an "egregious impropriety on the part of the" Tribunal, the Court confirms the Tribunal's decisions and denies TIG's motion to vacate.  *See Weiss v. Sallie Mae, Inc.*, 939 F.3d at 109.  Given this finding, the Court need not consider Mobil's remaining

arguments for why the Tribunal did not manifestly disregard the law or that TIG's motion to vacate was not timely.

**B.      Interest**

Mobil requests, in the event that the Court confirm the arbitral award, that it also award Mobil post-breach interest, consisting of both pre- and post-Award interest.  (Doc. 37 at 15-22.)  TIG opposes this request, arguing that the "ADR Endorsement contains an express damages cap, limiting Mobil's potential recovery, including any award of interest, to the TIG Policy's $25 million limits of liability."  (Doc. 41 at 20.)  "Because the Panel awarded Mobil the TIG Policy's $25 million [limit]," TIG argues, Mobil "is not entitled to recovery any prejudgment interest."  (*Id.*)  TIG does not dispute that the $25 million awarded by the Arbitral Tribunal did not include an award of interest.

1.      The Arbitral Tribunal's Decision With Respect to Interest

As Mobil concedes, if the Arbitral Tribunal had the authority to award interest and chose not to do so, the Court would lack authority to award interest.[3]  *See Finger Lakes Bottling Co. v. Coors Brewing Co*. 748 F. Supp. 2d 286, 289 (S.D.N.Y. 2010) (citing *In re Levin & Glasser, P.C. v. Kenmore Prop. LLC*, 70 A.D. 443 445, 46 (2010); Doc. 37 at 18. Because the Court finds that the Tribunal determined that it lacked jurisdiction to award interest if it found TIG liable for the full $25 million policy limit before interest, as TIG argued before the Tribunal that it should, the Court finds that it may consider the issue.

In the proceedings before the Arbitral Tribunal, Mobil argued that New York law, including N.Y. C.P.L.R. §§ 5001 and 5004, provided that it was entitled to pre-judgment interest at a rate of nine percent per year.  (*See* Award ¶ 135.)  In declining to award Mobil interest, the Tribunal specifically noted that its analysis turned not on the laws Mobil cited, but on whether the parties "vested in the Tribunal the authority to make an award of pre-judgment interest if making such an award would exceed the limits of the

---

[3] The parties seem to agree that this potential limitation to the Court's ability to award interest applies only with respect to pre-award, pre-judgment interest, the only form of interest the Tribunal considered.

policy." (*Id.* ¶ 137.)  Examining the language of the ADR Endorsement, the Arbitral

Tribunal found "award" to be an "all-inclusive term" that "includes damages, interest,

cost and legal fees that a panel may determine is owing on a claim" and that the Tribunal

was, therefore, jurisdictionally prohibited from imposing an award beyond the $25

million policy limit.  (*Id.* ¶ 139.)  "Our arbitral 'decision [or] award' has been constrained

by agreement of the parties to be no more than the policy limits," the Panel wrote.  (*Id.* ¶

140) (alteration in Award.)  "The Tribunal lacks jurisdiction" to award pre-judgment

interest on "the damages award if it would exceed the limits of liability of the policy."

(*Id.* at ¶ 141.)

In closing the Tribunal opined that, while it was jurisdictionally limited in its

ability to award interest here, "*In re Levin & Glasser* does seem to imply that where the

arbitrator would lack jurisdiction or be prohibited from making an award of pre-judgment

interest and the claim could not have sought an award of interest, the claimant is not

foreclosed from seeking such pre-judgment interest in a subsequent proceeding to

confirm an award."[4]  (*Id.* at ¶ 141 n. 4 (citing 70 A.D. at 445-46).)

---

[4] TIG attempts to distinguish the facts here from those in *In re Levin & Glasser*, and the other authorities cited by Mobil.  For example. TIG argues *In re Levin & Glasser* "did not involve a case in which there was a prohibition on the award of interest in the arbitration in the arbitration agreement.  As such its ruling has no bearing on the present facts."  (Doc. 41 at 21.)  The Court is slightly puzzled by this attempt at distinguishing the cases because TIG goes through great pains in its papers to note that, here too, there was no prohibition on an award of interest, so long as the total amount of the award did not exceed $25 million. In any event, as TIG summarizes the decision, the court in *In re Levin & Glasser* reasoned that "[b]ecause the award-creditor could have sought pre-award interest from the panel . . . it was now barred from seeking such interest from the confirming court."  (*Id.* (citing *In re Levin & Glasser*, 896 N.Y.S.2d at 312-13).)  But here, the Tribunal determined that it could not award interest because it was jurisdictionally limited in awarding any amount above the $25 million policy cap.

TIG's contention that the ADR Endorsement "does not set forth jurisdictional limitations on the authority of the arbitrators" (Doc. 41 at 22) is perplexing, both because the Tribunal explicitly interpreted the matter as a jurisdictional one and because it seems that during the arbitral proceedings TIG argued that it *was a* jurisdictional issue.  (*See* Doc. 38-11 at 56 (arguing that the ADR Endorsement "expressly limits the jurisdiction of the dispute resolution body (in this case the Tribunal) as to the amount of any award issued"); Doc. 38-12 at 76-77 (arguing that the ADR Endorsement "is a provision that, gentlemen, defines your jurisdiction in terms of an award, and defines that jurisdiction as being limited to awarding the policy limited as state.").)

Because it is clear that the Arbitral Tribunal determined that it lacked jurisdiction to award Mobil interest on damages of $25 million, but did not interpret the ADR Endorsement to prohibit a Court from doing so, this Court can consider the issue.[5]  *See Finger Lakes Bottling Co.*, 748 F. Supp. 2d at 289 (S.D.N.Y. 2010); *In re Levin & Glasser*, 70 A.D. at 445.

### 2.    Mobil's Request for Interest Before this Court

Under New York law, "insurance policies are interpreted according to general rules of contract interpretation." *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 98 (2d Cir. 2012).  "The court must interpret the contract 'to give effect to the intent of the parties as expressed in the clear language of the contract.'"  *Intelligent Digital Sys., LLC v. Beazley Ins. Co., Inc.*, 716 F. App'x 1, 3 (2d Cir. 2017) (quoting *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 274 (2d Cir. 2000).  The "plain language of an insurance policy is construed 'in light of 'common speech' and the reasonable expectations of a businessperson.'"  *U.S. Fid. & Guar. Co. v. Fendi Adele S.R.L.*, 823 F.3d 146, 150 (2d Cir. 2016) (quoting *Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377, 383 (2003)).  A term is ambiguous if its language "could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person.'" *Morgan Stanley*, 225 F.3d at 275 (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir. 1997)).

---

If TIG is arguing that the Court cannot award interest because no aspect of the dispute was outside the Tribunal's purview, then the Court disagrees:  (1) as repeatedly stated above, the Tribunal determined that awarding interest on top of a $25 million-award was outside its jurisdiction; and (2) "Courts in this Circuit have found an award of pre-judgment interest to be appropriate" even where *"*the agreement between the parties states that an arbitration decision is final and binding" (so long as the arbitral tribunal could not have awarded interest).  *See Herrenknecht Corp. v. Best Rd. Boring*, No. 06 CIV. 5106 (JFK), 2007 WL 1149122, at *3 (S.D.N.Y. Apr. 16, 2007) (citing *Soft Drink & Brewery Workers Union Local 812, IBT v. Ali-Dana Bevs.*, No. 95 Civ. 8081, 1996 U.S. Dist. LEXIS 10585 (S.D.N.Y. Jul. 24, 1996); *Finger Lakes Bottling*, 748 F. Supp. 2d at 289.

[5] The Court also notes that in its order directing the parties to arbitration, it stated that it would "retain jurisdiction to consider any issues that may arise after the arbitrators have rendered their awards . . .." (Doc. 22 at 25:6-8; *see also* Doc 29 at 2.)

Generally, under New York Law, "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract." N.Y. C.P.L.R. § 5001(a). Courts have considered the awarding of interest on breach of contract claims, to be "non-discretionary." *See Turner Const. Co. v. Am. Mfrs. Mut. Ins. Co.*, 485 F. Supp. 2d 480, 490 (S.D.N.Y. 2007). Post-award, pre-judgment interest, expressly covered by N.Y. C.P.L.R § 5002,[6] has also been described as "mandatory under New York law."[7] *See Sayigh v. Pier 59 Studios, L.P.*, No. 11 Civ. 1453 (RA), 2015 WL 997692, at *13 (S.D.N.Y. Mar. 5, 2015) ("Interest under CPLR 5002 is a matter of right and is not dependent upon the court's discretion or a specific demand for it in the complaint.") (citing *Goldberger v. Fischer*, 864 N.Y.S.2d 143, 144 (2d Dep't 2008).

TIG argues, however, that the same Policy provision that stopped the Tribunal from awarding interest also prevents the Court from doing so now. (*See* Doc. 41 at 20; Doc. 46 at 8.) According to TIG, the ADR Endorsement "contains an express damages cap, limiting Mobil's potential recovery, including any award of interest, to the TIG Policy's $25 million limits of liability." (Doc. 41 at 20.) In support of its argument, TIG points to the language of the ADR Endorsement—"any decision, award or agreed settlement made as a result of an ADR process shall be limited to the limits of the liability of this Policy." (*Id*. at 22 (citing Doc. 38-2 at Endorsement 11 ¶ 6).) The Policy's

---

[6] N.Y. C.P.L.R. § 5002 provides: "Interest shall be recovered upon the total sum awarded, including interest to verdict, report or decision, in any action, from the date the verdict was rendered or the report or decision was made to the date of entry of final judgment."

[7] TIG summarily dismisses Mobil's citations to the New York CPLR because it alleges it does not "address the issue of interest in the context of an arbitration." (Doc. 46 at 7.) TIG provides no support for its view that the New York CPLR does not apply. Federal courts hearing arbitration cases under diversity jurisdiction have recognized that state law governs the issue of prejudgment interest. *See, e.g. Oldcastle Precast, Inc. v. Liberty Mut. Ins. Co. Metra Indust., Inc.* 16 Civ. 1913 (NSR), 2019 WL 5884528, at *3 (S.D.N.Y. Nov. 8, 2019) ("The mere fact that a contract dispute is subject to arbitration does not preclude the granting of prejudgment interest" as provided in New York statutes.) (citing *Finger Lakes Bottling Co. v. Coors Brewing Co.*, 748 F. Supp. 2d 286, 290 (S.D.N.Y. 2010) and N.Y. C.P.L.R. § 5001(a)); *Commonwealth Assocs. v. Letsos*, 40 F. Supp. 2d 170, 177 n. 42 (S.D.N.Y. 1999) ("Prejudgment interest is governed by New York law both because this is a diversity case and because the arbitration agreement contains a New York governing law clause.").

reference to "decision," TIG presumably believes, encompasses an order by this Court. And, TIG argues, "[t]he scope of the phrase 'as a result of' includes things that are the 'natural and reasonable incident or consequence of' something else." (Doc. 46 at 10 (citing *Spirco Envtl., Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 555 F.3d 637, 642-43 (8th Cir. 2009). Because the Court's decision on whether to award interest "is incident to and a consequence of the arbitration," TIG argues, an order that TIG be required to pay pre-judgment interest would be a "decision . . . made as a result of" the arbitration, and as a result would be limited by the Policy's already-awarded $25 million limit. (Doc. 46 at 10.)

While Mobil characterizes the award of pre-judgment interest as mandatory, it provides no authority establishing that parties are not permitted to contract around that right. Indeed, the New York Court of Appeals has recognized that parties may do so. *See J. D'Addario & Co. v. Embassy Indus., Inc.*, 20 N.Y.3d 113, 118 (2012). However, courts in this District analyzing *J. D'Addario* have recognized that it adopted "a clear-statement rule governing waivers of a party's right under C.P.L.R. § 5001(a) to statutory prejudgment interest." *Katzman v. Helen of Troy Texas Corp.*, No. 12 Civ. 4220 (PAE), 2013 WL 1496952, at *6 (S.D.N.Y. Apr. 11, 2013) ("[P]arties may contract around that right, but to be valid, a party's waiver thereof must be clear and express."); *see also Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, No. 10 Civ. 9584 (JPO), 2014 WL 476299, at *3 & n. 1 (S.D.N.Y. Feb. 6, 2014), *reversed on other grounds*, 627 F. App'x 27 (2d Cir. 2015) (Agreeing with Judge Engelmayer's decision in *Katzman* that "a waiver of the right to statutory prejudgment interest must be clear," but disagreeing that it need be "express"). As recognized in *Katzman*, "[t]his reading accords with the New York Court of Appeals' requirements for waivers in other contexts." *Katzman*, 2013 WL 1496952, at *6 (citing *Fundamental Portfolio Advisors, Inc. v. Toqueville Asset Mgmt., L.P.,* 7 N.Y.3d 96, 104 (2006) (waiver "should not be lightly presumed" and "must be based on a clear manifestation of intent" to relinquish a right); *Gilbert Frank Corp. v. Fed. Ins. Co.,* 70

16

N.Y.2d 966, 968 (1988) ("Waiver is an intentional relinquishment of a known right and should not be lightly presumed."); *Navillus Tile, Inc. v. Turner Constr. Co.*, 2 A.D.3d 209, 211, 770 N.Y.S.2d 3 (1st Dep't 2003) ("[T]he intent to waive a right must be unmistakably manifested, and is not to be inferred from a doubtful or equivocal act.").)

The Court does not find the ADR Endorsement provides the necessary clear statement that Mobil waived its right to prejudgment interest. But, mindful that one might conceivably argue that the "clear-statement" rule is not an "evenhanded" method of construction, the manner in which the parties agreed the Policy would be interpreted, the Court notes that it is an independent basis for its decision and does not apply the "clear-statement" rule to the remainder of the analysis.

The Court does not read the ADR Endorsement as binding a court in a judicial proceeding. The Court finds that the ADR Endorsement's inclusion of the words "decision" and "award" to refer to those decisions or awards by ADR bodies. Both terms are associated with ADR processes. As Mobil notes, if the parties wanted the ADR endorsement to also apply to judicial proceedings they would have used terms like "order" or "judgment," terms that unmistakably relate to judicial proceedings. (Doc. 43 at 24.)

Interpreting the ADR Endorsement as such, and so as not to bar a court from awarding pre-judgment interest, results in a reading of the Policy that is consistent with "the reasonable expectations of a businessperson." *See U.S. Fid. & Guar. Co. v. Fendi Adele S.R.L.*, 823 F.3d at 150. If the parties intended the ADR Endorsement to prohibit Mobil from ever recovering interest from a court if TIG were found liable for the entire $25 million limit, then one would reasonably expect the parties to have negotiated a total cap on recovery higher than the policy's limit so as to allow Mobil to be made whole. *See Waterside Ocean Nav. Co. v. Int'l Nav. Ltd.*, 737 F.2d 150, 154 (2d Cir. 1984) ("In these days in which all of us feel the effects of inflation, it is almost unnecessary to reiterate that only if such interest is awarded will a person wrongfully deprived of his

17

money be made whole for the loss."); *see also Reading & Bates Corp. v. All Am. Marine Slip*, 953 F. Supp. 92, 95 (S.D.N.Y.), *aff'd*, 128 F.3d 793 (2d Cir. 1997) (noting that in a situation where the insurer decided not to pay the claim until judgment, "the insurer had the use and value of the money that rightfully belonged to the insured, for which the insured has a right to be compensated.") (citing *Ryan Walsh Stevedoring Co. v. James Marine Servs., Inc.*, 792 F.2d 489, 493 (5th Cir. 1986)).  Because the ADR Endorsement is limited to the policy limit, and because it uses words like "decision" and "award" that apply to ADR processes, a reasonable businessperson considering whether to agree to the Policy would likely have read the ADR Endorsement not to prevent a court from awarding interest if TIG were found to owe the entire policy limit in damages.

Similar reasoning was employed by the Second Circuit in *Bank of New York v. Amoco Oil Co.*, 35 F.3d 643 (2d. Cir. 1994).  There, the court considered whether a provision of a settlement agreement limiting "any recovery of damages" to a specified amount prevented the recovering party from seeking interest on the specified amount.  35 F.3d at 661.  The court determined that it did not, reasoning  that "if prejudgment interest were included in the meaning of the term 'damages,' then one would expect reasonable business people to agree to a cap on damages that is higher than the cap to which they would agree if prejudgment interest were excluded from the meaning of the term 'damages.'"  *Id.* at 662.  "The trouble," the Second Circuit reasoned "is that reasonable business people could not know with precision how the inclusion of prejudgment interest should affect the level of the cap on damages.  After all, neither party could know with precision when final judgment would be rendered."  *Id.*  The court, therefore, found that "reasonable businesspeople faced with uncertainty over how much prejudgment interest there would be would exclude prejudgment interest from the meaning of 'damages.'"  *Id.*

Moreover, following TIG's interpretation of the ADR Endorsement—that it prohibits a court's order of interest here because it is a "decision" that "is incident to and a consequence of arbitration" would lead to an absurd result.  *Wilder v. World of Boxing*

*LLC*, 310 F. Supp. 3d 426, 441 (S.D.N.Y. 2018), *aff'd*, 777 F. App'x 531 (2d Cir. 2019) (A "contract should not be interpreted to produce a result that is absurd.") (citing *Lipper Holdings v. Trident Holdings*, 1 A.D.3d 170, 171 (1st Dep't 2003); *RSUI Indem. Co. v. RCG Grp*. (USA), 890 F.Supp.2d 315, 326 (S.D.N.Y. 2012) (explaining that in interpreting contracts, including insurance contracts, absurd results should be avoided). As Mobil notes, the logic of TIG's interpretation would also prevent a court from awarding *post*-judgment interest if TIG continued to refuse to pay Mobil, essentially giving Mobil an indefinite interest-free loan. (Doc. 43 at 22, 24.)  TIG does not rebut this point.  But one need not extend TIG's reasoning to post-judgment interest to produce the absurd result.  Following TIG's interpretation, the longer it delays a judgment in this case—for example, as here, by filing a non-meritorious motion to vacate—the longer it will have free use of Mobil's money and the more Mobil's recovery will be diminished. *See Reichert v. N. MacFarland Builders, Inc.*, 85 A.D.2d 767, 768 (1981) (finding absurd result where interpretation meant that the "less time plaintiff spent on the project, the greater the gross profit, and hence a correspondingly larger bonus would accrue.")  The Second Circuit, albeit in the context of interpreting a settlement agreement, has also cautioned that courts should not interpret a contract "so as to create incentives for the defendant to delay while enjoying the free use of the plaintiff's money."[8]  *Bank of New York*, 35 F.3d at 662 (citing *Lowy and Donnath, Inc. v. City of New York,* 98 A.D.2d 42, 469 N.Y.S.2d 760 (1st Dept. 1983), *aff'd,* 62 N.Y.2d 746 (1984) (courts should avoid constructions that place one party at the mercy of the other)).

Given the above, and because, "[p]rejudgment interest is not a penalty but rather the cost of having the use of another person's money for a specified period," the Court

---

[8] The Court does not believe *Bank of New York* to be suggesting a method of interpretation that is violative of the Policy's dictate that it be construed "in an evenhanded fashion as between" TIG and Mobil, but, out of an abundance of caution, notes that it would reach the same result without reference to this principle.

finds that Mobil is entitled to pre-judgment interest.  *See Oldcastle Precast*, 2019 WL 5884528, at *3 (citing *Love v. State*, 78 N.Y.2d 540, 544 (1991)).  Mobil is entitled to nine percent *per annum* interest from the date of the breach, October 30, 2016,[9] until the date of the award, August 17, 2019,[10] and nine percent *per annum* interest from the date of the award through the date of the Court's judgment.  *See* N.Y. C.P.L.R. §§ 5001, 5002, 5004; *see also Seed Holdings, Inc. v. Jiffy Int'l AS*, 5 F. Supp. 3d 565, 591 (S.D.N.Y. 2014) (noting that even where federal law governs enforcement of the arbitration award, "courts in the Second Circuit generally apply the state statutory rate—in New York, nine percent, *see* N.Y. C.P.L.R. § 5004.") (citing *Westchester Fire Ins. Co. v. Massamont Ins. Agency, Inc.,* 420 F.Supp.2d 223, 227 (S.D.N.Y. 2005)).

### C.   Stay

Mobil asks the Court to lift the stay issued in this case on February 1, 2017 pending the outcome of arbitration.  TIG does not oppose this request.  Finding that the reasons for the stay no longer apply, the Court lifts the stay.

---

[9] The Policy provides "losses shall be due and payable by the [TIG] within thirty (30) days after they are respectively demanded and proven in conformity with this Policy."  (Doc. 38-2 at V(g).)  Mobil argues that a definitive demand for payment was made on May 17, 2016, but appears to concede that there may be some uncertainty about this and therefore "agrees to stipulate that its $25 million demand was made on September 29, 2016."  (Doc. 37 at 5.)  While TIG argues that Mobil is not entitled to this interest, it does not dispute this date.

[10] Mobil claims post-award, pre-judgment interest starting on August 14, 2019, the date of the Tribunal's decision.  (Doc. 37 at 21.)  While TIG disputes that Mobil is entitled to this interest, it argues, that in the event the Court finds otherwise, post-award, pre-judgment interest should only start running on August 17, 2019 when the award was emailed to the parties because that is when the decision became "ascertainable" to the parties.  (Doc. 41 at 25 (citing *Finger Lakes*, 748 F. Supp. 2d at 292).)  Mobil does not dispute this date in its subsequent brief.

### IV.    CONCLUSION

For the foregoing reasons, Mobil's motion to lift the stay and to confirm the Tribunal's award is GRANTED, and TIG's cross-motion to vacate the arbitral award is DENIED.  Mobil's request for pre-judgment interest is also GRANTED.[11]

The parties are directed to submit by May 22, 2020 a proposed judgment that accords with this Opinion and Order.

The Clerk of the Court is respectfully directed to terminate the motions at Docs. Nos. 36, 39, and 45.

It is SO ORDERED.

Dated:    May 18, 2020
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.

---

[11] Mobil's request for oral argument (Doc. 45) is denied as moot.